THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN L. McKINNEY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:14-cv-00101 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| G4S GOVERNMENT SOLUTIONS, INC., | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff John L. McKinney, Jr. filed this action against his employer, G4S Government

Solutions, Inc. (G4S), asserting the following claims: (1) a hostile work environment claim under

both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e, based on his race (African-American); (2) a retaliation claim under the same two

statutes;[1] and (3) a claim for intentional infliction of emotional distress under Virginia law.

Pending before the court is G4S's motion for summary judgment. (Dkt. No. 43.) G4S

contends that it is entitled to summary judgment in its favor as to all of McKinney's claims.

First, it argues that the undisputed evidence establishes that it has satisfied each of the

requirements of the *Faragher/Ellerth* affirmative defense,[2] entitling it to judgment in its favor on

the hostile work environment claim. Second, it posits that McKinney's retaliation claim fails

both because he did not engage in protected activity before receiving the May 24, 2013 write-

ups, and because no legally sufficient retaliatory action was taken against him at any time. Third

and finally, it argues that McKinney has failed to establish at least two of the four elements of his

---

[1] The complaint does not list retaliation as a separate count, but the court presumes that the retaliation
claim is asserted under both Title VII and Section 1981, and the parties treat it as such.

[2] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S.
742 (1998), are the two cases in which the Supreme Court first crafted the affirmative defense.

emotional distress claim.

The motion has been fully briefed, the court heard argument on the motion on September 14, 2015, and the court has considered all written submissions, including the supplemental briefs filed after the hearing. For the reasons set forth below, the court will grant G4S's motion for summary judgment.

## I. BACKGROUND

The court construes the evidence, and reasonable inferences therefrom, in the light most favorable to McKinney, the non-moving party. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 714 (4th Cir. 2013).

### A. McKinney's Employment With G4S

McKinney, who is African-American, was hired by G4S in September 2005 to work as a Security Officer at the Radford Army Ammunition Plant (RFAAP). (Allen Decl. ¶ 8, Dkt. No. 44-1, at 3-19.)[3] RFAAP is operated by BAE Systems, Inc. (BAE), pursuant to a contract with the Department of Defense. (Allen Decl. ¶ 4.) At all relevant times, BAE subcontracted with G4S to provide certain on-site services at RFAAP. These included security services, fire protection services/EMT, janitorial services, and copying and mail services. (*Id.*)

G4S is a Florida corporation with both domestic and international operations, and the primary individuals involved in investigating and remedying the alleged harassment are not based at RFAAP. These include Senior Vice-President Rich Allen—who is also African-American and is directly responsible for oversight of G4S's operations at RFAAP—and Rob Handel, the human resources employee who was tasked with investigating McKinney's

---

[3] G4S's summary judgment exhibits, *i.e.*, declarations, deposition excerpts, and exhibits, are grouped together. For example, Dkt. No. 44-1 consists of 105 pages but contains numerous different documents. The court will cite to the full range of a document the first time the document is cited in this opinion, but will thereafter just refer to the page number or paragraph within the document and not the docket number. Also, an appendix containing a list of all of G4S's exhibits is set forth at Dkt. No. 44-1, at 1–2.

complaint. (*Id.* ¶¶ 1, 4–5, 14; Handel Decl. ¶¶ 2–3, 8–10, Dkt. No. 44-1, at 26–55.) G4S's highest-ranking supervisor located at RFAAP during most of the pertinent time was Project Manager Shawn Lewis, who McKinney alleges was his primary harasser. Lewis reported directly to Allen, who reported to G4S's President. (Allen Decl. ¶¶ 5–6.)

On February 20, 2012, McKinney was promoted to corporal (now called relief captain) and received a 16% raise. (*Id.* ¶ 8; McKinney Dep. 31–32, Dkt. Nos. 44-3 and 50-2; McKinney Dep. Ex. 3, Dkt. No. 44-3, at 95.)[4] Approximately six months later, on September 6, 2012, he was promoted to the position of shift captain (on the second shift) and received an additional 3.8% raise. (McKinney Dep. 33 & Ex. 4, Dkt. No. 44-3, at 96.) In late May 2013—mere weeks after the most serious incidents of harassment alleged by McKinney—he was transferred to the position of first shift captain. Notably, the first shift is McKinney's preferred shift, and he testified that it is a more prestigious position than second shift, because it involves both more responsibilities and more personnel to supervise. (McKinney Dep. 37–39; *see also* Anderson Decl. ¶ 6, Dkt. No. 44-1, at 20–25.) McKinney remains employed in that position today. At no point during his employment was McKinney demoted, and, as noted, his salary increased twice in 2012, and it has not been reduced since.

**B.    Alleged Incidents of Harassment**

The most severe incidents of harassment—which the court refers to as the "noose incident" and the "sheet incident"—occurred on May 23, 2013. McKinney also testified about two prior incidents when he heard offensive comments, neither of which McKinney reported to

_____

[4] Neither party included the entirety of McKinney's deposition. Excerpts are found at Dkt. No. 44-3, at 31–93, Dkt. No. 50-2, and Dkt. No. 53-1, at 16–26. When citing to deposition *exhibits*, citations to the electronic docket also will be provided.

3

anyone prior to May 2013.[5]  (McKinney Dep. 52–55, 57.)  The noose incident occurred when McKinney first arrived at work on May 23.  As he walked into the common area near his office, he saw Shawn Lewis and three other white employees standing in a group and laughing.  The others were J.C. Allison, Greg Gravley, and Ryan Gellner.  (*Id.* at 60–62.)  Lewis said, "I am going to ask, I am going to ask [McKinney]," and, as Lewis said that, the three others walked away into their respective offices, with at least two of them laughing.  (*Id.* at 81.)

When McKinney asked what was going on, Lewis asked him if he knew there was a noose hanging on a nail inside a small closed cabinet outside the security captain's office.[6] Lewis then had McKinney follow him to show him the noose, and directed McKinney to get rid of it, despite McKinney's protests.  (*Id.* at 82–84.)  McKinney, who retained the noose rather than throwing it out, has since described that the noose and rope together are longer than 16 feet, and about one and one-half inches to two inches in diameter.  (*Id.* at 86; Pl.'s Opp. to Mot. for Summ. J. 4 n. 4, Dkt. No. 50 (Pl.'s Opp.).)

---

[5]  McKinney alleges that the first of the two statements was made in 2011, when a janitor, Joe Roth, used the N-word in McKinney's presence, although McKinney did not reference that as an incident of harassment in his deposition.  (McKinney Dep. 57, 94.)  Second, in the fall of 2012, fire chief Jay Altizer told McKinney that G4S had hired "a colored boy" as part of the fire-fighting squad.  When McKinney objected to Altizer about his using that term, Altizer responded that he wasn't there to make friends.  (*Id.* at 52–53.)  In his deposition, McKinney stated that his racial harassment claim was based only on the Altizer comment and the noose and sheet incidents.  Later, though, in response to questions from his own counsel, McKinney also testified that he complained in late May 2013 about a Confederate flag sticker on a dope pipe in a contraband case, and that he learned from co-workers about several other incidents that he thought were incidents of racial harassment directed at them.  These consist of: (1) an incident shortly before McKinney's deposition in which an non-supervisory employee used the N-word and was suspended for a day; (2) a comment by the same employee that a white woman with "interracial children" was "a cakey-headed bitch"; (3) a statement made to another African-American woman, shortly after she was hired (which was decades before the incidents here), that the company "didn't need her kind"; and (4) an instance in which the same woman felt she was paid less because of her race.  (*Id.* at 360–62.)  These alleged acts of harassment were not directed at McKinney, and he does not claim that they are part of his hostile work environment claim.  To the extent McKinney attempts to use them to prove that G4S's remedial action was ineffective, though, the court addresses them in the context of that argument.

[6]  It is not clear how long the noose had been there or who placed it there, and McKinney complains about G4S's failure to investigate more thoroughly the noose's origins.  Since McKinney removed it, he brought it back to RFAAP once to photograph it in the cabinet.  (McKinney Dep. 105, 110–13.)

4

As McKinney was walking away with the noose, a non-supervisory employee, Joe Roth, walked by and said, "I know what to do with that. I can use that around my house." (McKinney Dep. 92–94.) McKinney explained that Roth lives in a neighborhood with African-American neighbors and that he interpreted Roth's comment as referring to using the noose on his African-American neighbors. (*Id.* at 93–94.) McKinney also testified that Roth had used the N-word once before in McKinney's presence, although it was not directed toward McKinney. (*Id.* at 94.)

As noted, Roth was not a supervisor. Gellner was a shift captain like McKinney, although on a different shift. Lewis, Allison, and Gravley were all supervisors and Lewis and Allison were in McKinney's direct chain of command. As already noted, Lewis was the G4S Project Manager and the highest-ranking on-site supervisor for G4S. He had been the project manager since April 1, 2013, and was hired by—and reported to—Rich Allen. Allison, the security chief, reported to Lewis, and McKinney reported to Allison. Gravley was the head of the janitorial and fleet services. (Allen Decl. ¶ 6.)

As he left with the noose, McKinney went to Gravley's office and conveyed to Gravley that he couldn't understand why Gravley would participate or laugh about the noose, because McKinney believed they were friends.[7] Gravley laughed and said he had nothing to do with the noose. (McKinney Dep. 96–97.)

The sheet incident occurred shortly thereafter, on the same day. Lewis was in the supply room as McKinney walked by. Lewis was on a ladder in the room, and asked McKinney to come in and hold a box. Gellner was walking toward the room at the same time and McKinney asked Gellner to go hold the box instead, so that McKinney could get ready to start his shift.

---

[7] According to the report prepared after G4S investigated, Gravley told G4S that McKinney said, "I thought we were boys." (Handel Decl. ¶ 20 (summarizing witness statements).) McKinney initially testified that he could not remember the exact words he used, but when asked if that is what he said, he agreed. (McKinney Dep. 96–97.) Gravley also thought, but was "not sure," that McKinney was being humorous. (Handel Aff. ¶ 20.)

5

Gellner did so, and McKinney walked away. But McKinney heard the two men laughing and went back to see what they were doing. When McKinney looked in the supply room, he saw Lewis standing on a ladder and holding a white sheet above Gellner's head, so that it "form[ed] a triangle-shaped cylinder . . . like a KKK hood." (*Id.* at 126–29, 365.)

McKinney said to them, "Really? You all don't have to do that to get me gone. The only thing you have to do is tell me." (*Id.* at 129.) Neither of them said anything, according to McKinney. (*Id.* at 131–32.)[8] Gellner subsequently apologized to McKinney and told him he had nothing to do with the incidents, saying "You know that's not me. I have got a [biracial] kid. You know me better than that." In response, McKinney said, "Are we cool?," to which Gellner responded, "Yeah." (*Id.* at 135–37.)

## C.    The "Bogus" Write-ups

McKinney also alleges that the day after the noose and sheet incidents, on May 24, he received from Allison what he calls "two bogus write-ups," which were on forms titled "Employee Counseling." (McKinney Dep. 166 & Exs. 19–20, Dkt. No. 44-4, at 12–15 (forms).) Although both are dated May 23, and he signed and dated both of them May 23, McKinney testified that they were given to him on May 24, and that he was told to backdate them. (McKinney Dep. 194–97.) The reports counseled him for failing to complete certain paperwork, and he disputes that at least some of that paperwork was his responsibility. Instead, he says that others had agreed to prepare and file those reports for him. (*Id.* at 197–201.) In his deposition, McKinney claimed that he received the write-ups because Lewis was upset that he (Lewis) had been chastised by his superiors for working McKinney and others long hours. (*Id.* at 180–81,

---

[8] During G4S's later investigation of the incident, Lewis recounted that Gellner had said, "Now things are coming together." McKinney did not hear the comment and testified instead that no one said anything. (McKinney Dep. 131–32.)

184–86, 188.) McKinney never testified that he believed he received those forms as retaliation for his complaint, despite his counsel's arguments to that effect. In any event, it is undisputed that those counseling forms did not result in any demotion or reduction in his pay.

## D. McKinney Complains to Non-G4S Supervisors; G4S Management Learns of His Complaints and Investigates

Significantly, G4S had a policy that prohibited racial discrimination and harassment, and directed an employee to "immediately" report any such harassment to his "supervisor, a manager, or to the Corporate Human Resources Department." (McKinney Dep. Ex. 16, Dkt. No. 44-4, at 9–10.) McKinney did not report the harassment to any of the persons listed in the policy.[9] Instead, after receiving the two counseling forms on May 24, McKinney complained to Lieutenant Colonel Penland, the highest-ranking Army officer at RFAAP, about racial harassment. (McKinney Dep. 165–66.) McKinney specifically complained about both of the May 23 incidents, about the two "bogus" write-ups by Allison, and about the existence of a dope pipe with a Confederate flag sticker that was displayed in a case at RFAAP.[10] (*Id.* 24–25, 165–67.) McKinney also testified that he complained to Margie Akers in "late May or the beginning of June" 2013, about both Altizer's slur and the noose and sheet incidents (*id.* at 54), but she serves in a non-supervisory role. (Anderson Decl. ¶ 13 & Ex. 1.)[11] Further, the record reflects

---

[9] McKinney admits that he never complained to his direct supervisor, Allison, about racial harassment, but argues that his complaints to Lewis and to Gravley during the noose incident itself should be construed as complaints to management. (Pl.'s Opp. 31–32.) As discussed *infra* at Section II.B.3., however, a complaint to the alleged harasser or harassers is not a reasonable report to the employer for purposes of *Ellerth* and *Faragher*.

[10] The pipe was kept in a locked display shelf with other contraband, as examples of confiscated items that were not permitted on premises. Lewis testified that, at Penland's instruction, and presumably after McKinney complained, Lewis removed the Confederate flag sticker and returned the pipe to the case. (Lewis Dep. 39–40, Dkt. No. 50-8; Allison Dep. 14–15, Dkt. No. 50-19.)

[11] McKinney testified that he believed Margie Akers was a supervisor over certain other people, despite her job description as set forth by G4S, which identifies her as a non-exempt, salaried employee who does not supervise others and who cannot hire, fire, promote, demote, or effectively recommend such actions and who does not prepare performance appraisals. (*Compare* McKinney Dep. 54 *with* Anderson Decl. ¶ 13 & Ex. 1.) The court concludes that this dispute is not material for purposes of ruling on the summary judgment motion. "A fact is

7

that the conversation with Akers took place on June 19, 2013, and was tape-recorded by McKinney. There is no mention of the racial slur in the transcript of that recording. (McKinney Dep. 323–25.) There is also evidence that McKinney complained to Walter Suthers, who worked for BAE, (Suthers Dep. 16–17), although the timing of that complaint is less clear, and it may have been after McKinney spoke with Allen, as discussed next.

The first time, then, that McKinney complained to any member of G4S management was when SVP Allen came to him and asked to meet with him on Friday, May 31. On that date, Allen was at RFAAP and learned from the receptionist, Shirley Turner, that McKinney was upset about an incident involving a noose and a "KKK sheet," and that Lewis was involved in the incident. (Allen Decl. ¶ 11.) Allen avers that he was "surprised and appalled" to learn about the allegation, and he requested a meeting with McKinney that afternoon. (*Id.*)

During the meeting, McKinney recounted both the noose and sheet incidents to Allen. Allen told McKinney that neither he nor the company tolerated that kind of conduct, he apologized to McKinney, and advised him that there would be an investigation and that those responsible would be held accountable. He instructed McKinney to contact him personally if he had any concerns, and gave him a business card with his personal cell phone number. (McKinney Dep. 221–22; Allen Decl. ¶ 13.)

After the meeting, Allen telephoned Rob Handel, G4S's Manager of Employee Relations (who was based in Florida), and said he was going to recommend that Handel come immediately to RFAAP and look into various employee concerns. Specifically, Allen asked Handel to investigate morale problems that G4S was experiencing at RFAAP, and also wanted him to look

---

material if it 'might affect the outcome of the suit under the governing law.'" *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citations omitted). Whether Akers is management is immaterial because, at around the same time that McKinney complained to Akers (if not earlier), Allen learned about McKinney's complaints and requested an investigation.

into McKinney's complaint of racial harassment. (Allen Decl. ¶ 14.) Two business days later, on Tuesday, June 4, Handel arrived in Radford and stayed through June 6. During that time, he met with McKinney at a Burger King, received McKinney's complaint, and began an investigation into McKinney's harassment allegations. He also met with over thirty people to discuss the morale issues. That investigation revealed that many employees, particularly in the security division, were not happy with Lewis. Handel requested, and received, approval to return to RFAAP to investigate McKinney's claim more fully, and scheduled his return visit for the week of June 18. (Allen Decl. ¶ 16.)

Allen returned to RFAAP on June 11 and 12 and followed up with McKinney then. (*Id.* at ¶¶ 16–17.) As part of that follow-up, Allen assured McKinney that there would be no retaliation for his report of harassment, nor for McKinney's having contacted an attorney. Allen told McKinney that he was free to contact him at any time on his cell phone if he had problems or concerns. He also advised McKinney that Handel would be returning the following week to complete the investigation. Additionally, before leaving RFAAP, Allen spoke with those involved in the harassment (Lewis, Allison, Gravley, and Gellner), told them that Handel would be investigating, and reminded them that they "were to treat McKinney, and everyone for that matter, with dignity and respect." (*Id.* at ¶ 18.)

Handel returned to Radford on June 18 for his more in-depth investigation into McKinney's allegations. He met with and interviewed the people McKinney identified as being involved in or witnessing either the noose or the sheet incident. Handel took extensive notes of his interviews during both of his sessions at RFAAP. His typed report and summary of his investigation from the second visit is three pages long and contains a summary of each interview. (Handel Dep. Ex. 36, Dkt. No. 44-3, at 4–6.) Pertinent here, the persons involved in the noose

and sheet incident, including Lewis, told different versions of those events than McKinney had related, and flatly denied some of his allegations.

For example, as to the sheet incident, both Gellner and Lewis said there was a folded canvas that was found in the course of cleaning out a closet, but Gellner denied that anything inappropriate was done or said about it, and Lewis said Gellner made a comment, but regretted saying it and did not mean any offense.[12] As to the noose incident, several of those interviewed—including Lewis—admitted that a noose had been found and that Lewis had asked McKinney to get rid of it. But the remainder of McKinney's allegations, including that the others were laughing about the noose, were denied. Allison also told Handel that he knew Lewis had found the rope, but that Allison did not see the rope because he was on the phone. All four of those present also denied that anything racial was said. As summarized by Handel, "it goes to the word of one employee against the word of four other employees." (*Id.*, Dkt. No. 44-3, at 5.)

Based on the information available to him, Handel reported back to Allen that McKinney's versions of the noose and sheet incidents were disputed by the other employees present in significant respects. He also relayed that several of the employees, including Allison, had reported to him that perhaps McKinney's complaints were intended to cover up his own performance issues. (*Id.*, Dkt. No. 44-3, at 6 ("From all that I have observed and what has been reported, I believe Mr. McKinney has some performance challenges in his position and he is reacting to his being held accountable.").) In particular, Handel's report seemed to give considerable weight to Allison's comments and views. Handel explained that "Allison is known to take his job very seriously and I trust his credibility," both because Allison's observations on

---

[12] In his deposition, Lewis seemed to admit that McKinney's description of the sheet incident was accurate in some respects, although Lewis placed the blame for the comment entirely on Gellner. (Lewis Dep. 83–87, Dkt. No. 50-8; Lewis Dep. Ex. 28, Dkt. No. 44-3, at 30.)

the morale issues had been corroborated, and also because other employees consistently reported that Allison was "strict, not afraid to tell it like it is," that he went "by the book," and that he was "fair with everyone." (*Id.*) Allison also had recommended McKinney for a promotion to shift captain in September 2012, which lent credibility to his current concerns over McKinney's performance.

Nonetheless, Handel was concerned enough about the incidents (and the noose, in particular) to recommend that all security supervisors be required to undergo diversity training. By the time Handel's report was completed, moreover, Lewis had already been removed from his position at RFAAP, as the court discusses next.

### E.    Lewis's Removal and Other Remedial Action

The day before Handel returned to RFAAP to complete his investigation of McKinney's complaint, Suthers—the BAE employee who was G4S's primary client contact—contacted Allen and told him that he wanted Lewis removed as project manager. He said he had lost confidence in Lewis's leadership and pointed to a number of concerns, many of which had been verified by Handel's first investigation into G4S employee morale at RFAAP. (Allen Decl. ¶ 19 & Ex. 3, Dkt. No. 44-1, at 19.) Suthers told Allen, though, that he wanted a smooth transition, so that getting a replacement would not be disruptive to operations. Allen began looking for a replacement. (*Id.*)

Several days later, though, Suthers approached Handel (who was at RFAAP investigating McKinney's allegations) and told him that he had learned that McKinney was filing an EEOC charge related to the noose. As a result, Suthers and BAE wanted Lewis removed from his position at RFAAP immediately. Suthers contacted Allen, through Handel, and asked that Lewis be removed. Allen agreed and directed Handel, who was on-site, to remove Lewis from the

11

premises and place him on administrative leave. (Allen Decl. ¶ 20; Handel Decl. ¶¶ 18–19.) Handel then completed his investigation. Rather than reassigning Lewis to another project, Allen terminated Lewis's employment with G4S on June 28, 2013. (Allen Decl. ¶ 21.)

As had been recommended as part of Handel's investigation, G4S also scheduled and conducted diversity training for all of its security supervisors before the end of the calendar year.

## F. Alleged Retaliation

Both during and after the investigation, Handel and Allen had fairly regular contact with McKinney to ensure he was doing okay and to address any concerns he had. (*E.g.*, Handel Dep. Exs. 43, 46–48, Dkt. No. 44-3, at 18-21 (Handel's records of phone calls from McKinney), *id.* Ex. 49, Dkt. No. 44-3, at 22–23 (summary of post-investigation communications between McKinney and Allen); McKinney Dep. Ex. 23, Dkt. No. 44-4, at 17–31 (screen shots of text messages between McKinney and Handel, which also reference communications McKinney had with Allen).) At his deposition, McKinney conceded that, from time to time in the months following, Allen asked him if the other people involved in the noose incident were treating him with respect, and that McKinney told him yes, they were. (McKinney Dep. 232–34.)

McKinney also testified, however, that he has suffered continuing acts of harassment and retaliation, although he does not claim that any of those acts are racially motivated. First, he testified that, after he complained to Penland, but before Lewis was terminated, Lewis asked McKinney if he was going to quit, which McKinney contends shows that Lewis wanted him gone. Even after Lewis's termination, Lewis would call McKinney's office and ask for Allison, instead of calling Allison directly. (*Id.* 238–39.) Second, McKinney also claimed his car was dented and twice he went to his car and it had flat tires. He blamed Shawn Lewis for the damage to his car, although he was not sure it was Lewis. Third, he testified that a G4S employee was

12

overheard saying, "We need to get rid of his ass," referring to McKinney. This employee was one of McKinney's subordinates, though, and McKinney has not pointed to any evidence that this statement was ever reported to G4S management or others. (*See* Suthers Dep. 38–39 Handel Dep. 134.) Fourth, he testified that Allison, his direct supervisor, called him on consecutive days "all the time" after hours to ask insignificant questions, which he felt was harassing, although not "racially harassing." (McKinney Dep. 239–40.)

At his deposition, McKinney also expressed a litany of complaints about the way he was supervised by Allison, although some of them were seemingly contradictory. For example, he complained that Allison does not pay attention to him, but also that Allison micromanages him. He said that Allison had a "different attitude" toward him than toward the other captains, and that Allison modified reports McKinney had submitted, even though McKinney thought the reports were good. (*Id.* at 239–247.) Finally, he complained that Allison joins with the union to accomplish things, and McKinney hears about changes from the union instead of from Allison. He believes that these actions are retaliatory because McKinney decided to stand up for himself and report the harassment he suffered in May 2013, but admitted that he did not "have any real facts to base that on." (*Id.* at 247.) And again, he repeatedly denied that any of these allegedly retaliatory acts were racial harassment. (*Id.* at 234–35, 240, 242, 246.)

McKinney also subsequently complained to Allen about being excluded from meetings; *i.e.*, management not telling him they were holding meetings, or that they would move locations to avoid him, and also complained that Allison, Gellner, and Gravley were having meetings elsewhere after riding away together (e.g., the three of them they would all hop in a vehicle and take off and go riding inside the plant). (*Id.* at 227–228). He also complained to Allen about

13

Allison's management style, saying Allison was "hard on [him], [and] that [Allison] was not fair, or words to that effect." (*Id.*)

## II.  DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).  Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.3d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).  "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th

14

Cir. 1996).

**B.      G4S Has Established Its Affirmative Defense to McKinney's Hostile Work Environment Claim.**

Title VII of the Civil Rights Act of 1964 prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a discriminatory or abusive working environment. *See Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 2440 (2013).

McKinney claims that the harassment he endured created a hostile work environment. To recover on such a claim under Section 1981 or Title VII, McKinney must prove that the conduct was: (1) unwelcome; (2) based on his race; (3) "sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive work environment"; and (4) that there is some basis for imputing liability to G4S. *See Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc).[13] For purposes of its summary judgment motion, G4S concedes that McKinney can make out a *prima facie* case of a racially hostile work environment. (Def.'s Mem. Supp. Mot. for Summ. J. 27, Dkt. No. 44.) This is consistent with Fourth Circuit precedent as to what constitutes severe or pervasive harassment. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at 280 ("[A] reasonable jury could find that [a supervisor's] two uses of the 'porch monkey' epithet . . . were severe enough to engender a hostile work environment.").

---

[13]     McKinney's § 1981 and Title VII hostile work environment claims have the same elements. *Boyer-Liberto*, 786 F.3d at 277 (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001)). Likewise, his retaliation claim is the same under either statute. *Id.* at 281 (citing *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004)). Thus, the court's analysis herein—while referring primarily to Title VII—applies with equal force to McKinney's § 1981 claims.

15

Despite this concession, G4S asserts that it cannot be held liable because it is entitled to rely on the *Faragher*/*Ellerth* affirmative defense. In cases—like this one—where the harasser is the victim's supervisor, then the defense is available to an employer only if no tangible employment action is taken.[14] *Vance*, 133 S. Ct. at 2439; *Boyer-Liberto*, 786 F.3d at 278. If no tangible employment action is taken against the plaintiff, then "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 133 S. Ct. at 2439 (citing *Faragher*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Thus, to prevent liability here, G4S must first show that no tangible employment action was taken against McKinney, and then must establish there are no disputed facts as to each of the two prongs of the defense. The court addresses each of these three requirements in turn.

**1. No tangible employment action was taken against McKinney.**

The parties argue about whether a tangible job action was taken against McKinney, but the undisputed evidence in the case clearly shows that none was taken. McKinney contends that he suffered a tangible job action because: (1) he received "two unfounded write-ups"; and (2) after May 23, 2013, he was "singled out for discipline, shunned at work, belittled, and ostracized." (Pl.'s Opp. at 21.)

The Supreme Court has defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524

---

[14] As noted, at least two of the persons involved in the noose incident (Allison and Lewis) were in McKinney's direct chain of command and were supervisors.

U.S. at 761; *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331 (4th Cir. 2012) (quoting same). Here, neither the two counseling forms nor the later alleged retaliatory acts qualify as a tangible employment action. In particular, McKinney suffered no financial consequences and no demotion or firing as a result of the write-ups or other actions, and remains employed today as a shift captain. *See, e.g., James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (concluding that a poor performance evaluation "merely causing a loss of prestige or status is not actionable" as a tangible employment action). Indeed, within a week of the two write-ups, McKinney was transferred from the second shift to the first shift captain position (where he has remained), and he acknowledges that his new position is more prestigious and requires the supervision of a higher number of employees, as well as being the shift he personally preferred. There was no "tangible employment action" here. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001) (rejecting plaintiff's argument that there was a tangible employment action and thus the affirmative defense was unavailable, where she "was not discharged, demoted, or reassigned" and instead she had received a raise, promotion, and good evaluations during her employment).

The types of snubs that McKinney describes as occurring after May 2013 likewise do not constitute a "tangible employment action," since they do not even constitute the less onerous "adverse action" for purposes of a retaliation claim. *Id.* at 270–71 (holding that the plaintiff's allegations of "uncivility" by her co-workers, "most of which constituted refusals to speak to her," did not constitute an adverse action to support a retaliation claim); *Munday v. Waste Mgmt., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity…."); *see Burlington N. &*

*Santa Fe Ry. v. White*, 548 U.S. 53, 66 (2006) (noting that a retaliation claim can be based on an adverse action that is less than a tangible job action). McKinney was never demoted, never had his pay docked, never had significant responsibilities taken away, and he has not even alleged—let alone put forward any evidence—that he has suffered any reduction in benefits, significant or otherwise. In short, he did not suffer a tangible employment action. *See Ellerth*, 524 U.S. at 761.

### 2. The undisputed facts establish that G4S satisfies the first prong of the affirmative defense.

Having determined that the affirmative defense is not foreclosed as a result of some tangible employment action, the court turns to whether G4S can establish, as a matter of law, both prongs of its affirmative defense. The first prong requires G4S to show that it exercised reasonable care to prevent and promptly correct harassing behavior. In the Fourth Circuit, "[d]istribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and promptly correcting" harassment. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) (quoting *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998)). An employee rebuts this proof only if he shows that the "employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional." *Barrett*, 240 F.3d at 266 (citations omitted).

It is undisputed that G4S has a policy prohibiting discrimination and harassment based on race; that the policy contained a procedure for reporting harassment, directing an employee "to immediately contact their supervisor, a manager, or the Corporate Human Resources Department"; that the policy prohibited retaliation against those who reported such harassment or participated in an investigation in good faith; and that McKinney received a copy of the policy upon being hired in 2008 and was shown an anti-harassment video, and received another copy of

18

a very similar policy in 2010. (McKinney Dep. 147–50, 158–160; *id.* at Exs. 12, 16, 17, Dkt. No. 44-4, at 9–10 (copy of policy); Dkt. No. 44-3, at 103 (McKinney's acknowledgement).)

McKinney tries to overcome this evidence, though, by relying on his own testimony that there was little training on the policy, and no retraining, although the employees were asked to sign forms saying that they had been retrained. He has also offered some evidence that at least one supervisor, Fire Chief Jay Altizer, actively discouraged people from making complaints, through threatening statements Altizer made at a meeting. But there is no evidence that McKinney was present at that meeting, that he knew about that threat, or that he otherwise felt threatened from making a report of harassment. To the contrary, he repeatedly asserts that he reported the harassment.

As pointed out in defendant's reply, moreover, the complaints about Altizer were primarily from firefighters supervised by Altizer, who was never in McKinney's chain of command. (Dkt. No. 53, Def.'s Reply Br. 20.) Significantly, no similar statements were made by McKinney's direct supervisor, Security Chief Allison. Also, the evidence in the record shows the threats by Altizer were made in 2011, years before the incidents at issue here. (Handel Dep. 49.) Overall, the court concludes that there is simply insufficient evidence in the record from which a reasonable jury could find the policy was dysfunctional or adopted in bad faith.

McKinney also contends that G4S cannot satisfy the first prong of the defense because it did not exercise reasonable care to promptly correct harassing behavior by its employees. But the undisputed evidence shows that prompt and effective remedial action was taken by G4S. An investigation took place within weeks of McKinney's complaint and the primary harasser was removed from his position. Critically, moreover, McKinney himself does not complain about any continued racial harassment at any point after Allen learned of his complaint.

19

McKinney admits these facts, but raises four basic arguments as to why a reasonable jury could conclude that the actions by G4S were insufficient. First, he claims he still felt "harassed," although not racially. Second, he points to the fact that, except for Lewis, those involved in the noose and sheet incidents remained employed and were not disciplined in any way. Third, he posits that Lewis was not removed by G4S in response to the complaint of harassment, but was removed because of other performance problems and at the request of BAE's employee, Suthers. Pointing to testimony from Handel that a BAE employee at another ammunition manufacturing plant had said the filing of McKinney's EEOC charge needed to be "contained," (Handel Dep. 121), McKinney also argues that a reasonable jury could find that G4S's actions "were not an investigation, but merely a cover-up." (Pl.'s Opp. 12.) Fourth, he contends that acts of harassment experienced by others show that the G4S's response was ineffective. *See supra* n. 5.

None of these arguments are meritorious and none prevent G4S from establishing that it acted promptly and reasonably to correct the harassment. As to his claim that he continued to be harassed, albeit not "racially," the Fourth Circuit rejected a similar argument in *Matvia*. There, although the plaintiff acknowledged that the sexual harassment she had faced stopped after the employer's investigation led to the termination of the harasser, she "question[ed] the adequacy" of the employer's corrective action by focusing "on the [subsequent] ostracism she suffered" at the hands of her co-workers. 259 F.3d at 268–69. The Fourth Circuit concluded that both this ostracism and the employer's response to it, were "irrelevant to the first prong of the affirmative defense," which requires only that the employer "correct promptly any *sexually harassing behavior*." *Id.* at 269 (citation omitted)(emphasis in original). Because the treatment she received at the hands of the other employees "was bereft of a sexual component," it did not undermine the employer's entitlement to the defense. *Id.*

20

Likewise, although McKinney argues in his summary judgment briefing that he has suffered workplace slights, he testified that none of that supposed "harassment" was racially motivated. Most tellingly, he explicitly testified that there had not been any racially harassing incidents from the time he first spoke to Allen on May 31 through the date of his deposition. (McKinney Dep. 234–35.) Thus, as in *Matvia*, other alleged harassment is irrelevant to the first prong of the affirmative defense. Further, much of what he claims was "harassment" is supported by business justifications, as explained by G4S to McKinney and in its briefing, and McKinney has not offered testimony disputing those explanations. (*See, e.g.*, Allen Decl. ¶¶ 23, 25 (explaining why McKinney's duties would not allow him, or did not require him, to participate in certain meetings that he alleged he was excluded from); Anderson Decl. ¶¶ 10–12 (same).)

The court likewise finds no merit in McKinney's assertion that G4S's response was inadequate because several of the alleged harassers remained employed. As the Fourth Circuit has recognized, "[p]laintiffs often feel that their employer 'could have done more to remedy the adverse effects of the employee's conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment.'" *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674 (4th Cir. 2011) (citation omitted). As the *Xerxes* court recognized,

> this standard "in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser. And a good faith investigation of alleged harassment may satisfy the . . . standard, even if the investigation turns up no evidence of harassment. Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred." *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 984 (4th Cir.1997) (internal quotation marks and citation omitted); *see also Adler* [*v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 667 (10th Cir. 1998)] ("The courts . . . must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from

21

the other direction of violations of due process rights and wrongful termination.")

*Id.* at 674–75.

Here, the employer undertook a good faith investigation, but the employees interviewed largely denied involvement with the noose, and McKinney himself did not allege that any of them were present when Lewis asked him to dispose of the noose. Those employees also denied making or hearing any racially offensive comments, and again, McKinney did not allege that any of the others (Allison, Gravley or Gellner) made any such comments. In light of the relatively weak evidence tying the others to racially inappropriate conduct or words (*i.e.*, it was basically McKinney's word against the word of four others that they were laughing when he approached), it was not unreasonable to require they undergo diversity training, but not otherwise discipline them. Lewis admitted he asked McKinney to dispose of the noose, though, so he was most culpable and it was reasonable to treat him more harshly. In short, the evidence is insufficient for a jury to find that the response was not reasonably calculated to end the harassment.

As to McKinney's third argument on this prong—that G4S removed Lewis not to remedy or prevent the harassment, but because of pre-existing morale problems attributable to Lewis or because Suthers requested his removal due to McKinney's filing of his EEOC charge—the court allowed the parties to provide any additional briefing on this issue after hearing argument. G4S's supplemental brief cites to a number of cases suggesting that the employer's motivation is irrelevant; and that when an employer's response causes harassment to cease, then its liability ceases, as well. (Def.'s Supp. Ltr. Br. 2–3, Dkt. No. 58 (citing *Mikels v. City of Durham*, 183 F.3d 323, 330 (4th Cir. 1999) ("[We] have given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question."); *Spicer v. Va. Dep't of Corrections*, 66 F.3d 705, 711 (4th Cir. 1995) ("[W]hen an employer's remedial

response results in cessation of the complained of conduct, liability must cease as well.")).)

G4S acknowledges one Fourth Circuit decision that seems to suggest there is a "limited exception to the general rule that cessation of harassment amounts to cessation of liability." (Def.'s Supp. Ltr. Br. 8–9 (citing *Paroline v. Unisys Corp.*, 9879 F.2d 100, 106 (4th Cir. 1989) *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990) (en banc) (per curiam)).) In *Paroline,* there was no further harassment after a plaintiff complained about sexual harassment by her supervisor, Moore, in part because plaintiff resigned based on her belief that the discipline imposed on Moore—which consisted of delaying his promotion and salary increase, putting him on a last chance agreement, and ordering him to limit contact with female employees—was inadequate. The court held that, despite the fact that no further harassment occurred, it was a jury question whether the employer had taken effective remedial action.

But in *Paroline*, the employer had notice, *before Moore began harassing the plaintiff*, that he had harassed other female employees. In a later decision, this distinction was "critical" to finding *Paroline* inapplicable. Specifically, in *Mikels v. City of Durham*, 183 F.3d 323 (4th Cir. 1999), the plaintiff relied on *Paroline* to argue that the employer's response was inadequate, but the Fourth Circuit held that such reliance was misplaced. Instead, the *Mikels* court reasoned that, because there was no "prior history of demonstrably ineffectual . . . sham responses" in the case before it, *Paroline* did not apply. *Id.* at 331. The case at bar is in line with *Mikels* and renders *Paroline* inapposite. As in *Mikels*, there is no evidence that G4S had prior notice that Lewis (or the others) were committing racial harassment and that it failed to take reasonable steps previously to prevent such harassment.

In his supplemental brief, McKinney points to *Ellerth* to emphasize that "the test is whether the employer exercised reasonable care to prevent and correct the harassment, not

whether further harassment was prevented as a side effect of a decision made not to prevent and correct the harassment." (Pl.'s Supp. Ltr. Br. 1, Dkt. No. 59.) McKinney also quotes extensively from the Seventh Circuit's decision in *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999). There, the court held it was a jury issue whether the employer had adequately discharged its duty to remedy harassment where it separated the plaintiff from the alleged harasser (who had sexually assaulted the plaintiff, among other harassment). In its discussion of the issues, the *Smith* court reasoned:

> The question is . . . whether [the employer's] response to the harassment was a reasonable one, designed to remedy the illegal harassment, or a negligent one that did not adequately respond to the situation in its midst. Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care.

189 F.3d at 535.

While that language seems to support McKinney's position, the employer's response there stands in stark contrast to the steps G4S took here. There, the court concluded a jury could reasonably find that the response did not effectively remedy the harassment problem where:

- the employer failed to discipline the harasser "for so serious an infraction as a criminal assault," and decided "instead to promote him";

- the harasser continued his hostilities toward other female guards even after his assault on the plaintiff, and even taunted "one of his victims that his supervisors wouldn't penalize him for his actions";

- the investigator suggested that the plaintiff "kiss and make up"; and

- the plaintiff was reassigned to "less desirable duty."

*Id.*

Here, by contrast, the main perpetrator—Lewis—was in fact terminated, and within a month after the incident, McKinney was not reassigned to "less desirable duty," but instead

24

received a transfer to a more desirable position. McKinney does not allege that he suffered any additional racial harassment by anyone. Further, the G4S management took McKinney's complaint seriously, investigated it, and took action, including re-training its security supervisors concerning its diversity policies. On this record, the court concludes that G4S's response cannot be deemed insufficient, regardless of its reasons for removing and terminating Lewis.

Fourth and finally, McKinney attempts to show that the action was ineffective because harassment continued in the workplace, but that attempt fails, too. As noted *supra* at note 5, McKinney points to several other incidents of harassment that he says show G4S's remedial action was ineffective in curing or preventing racial harassment at RFAAP. One of these, as McKinney admitted in his deposition, occurred "years" before the incidents at issue here and the court concludes it is irrelevant. (McKinney Dep. 362 (noting that a statement made to an African-American woman shortly after she was hired that "they didn't need her kind here" occurred "years back.").) The second incident involved a non-supervisory employee who, according to McKinney, used the N-word shortly before McKinney's deposition in reference to another employee and also called an employee who had bi-racial children a "cakey-headed bitch." (McKinney Dep. 360–61.) G4S challenges these statements as inadmissible hearsay, (Def.'s Supp. Ltr. Br. 10–11), but even if they were admissible, they cannot carry the weight McKinney assigns to them. He has pointed to no evidence that the "cakey-headed bitch" comment was ever brought to the attention of management. As for the use of the N-word, that occurred approximately sixteen months after Lewis's termination, and the company's response was swift. Upon learning about it, the employee was suspended for a day and told that, if he ever said the word again at work, he would be terminated. (Handel Dep. 135–36.)

25

To summarize, the evidence regarding G4S's response to McKinney's complaint shows that the first G4S supervisor that learned about the racial harassment (other than those allegedly involved) was Allen, who learned about it from one of McKinney's co-workers one week after McKinney complained to Penland, the Army's supervisor. That same day—May 31, 2013— Allen spoke to McKinney, told him he was horrified by the allegations, apologized to him, and told him G4S would investigate. Two business days later, Handel began investigating McKinney's allegations, as well as the general allegations about morale problems at RFAAP. Handel, too, apologized to McKinney, and also told him to let him know if he experienced any further problems. Within 20 days after that, the primary harasser, Lewis, had been terminated and removed from the site. While the others who McKinney alleges were involved were not disciplined, Handel's investigation had not revealed that the incidents occurred as McKinney described. Nonetheless, all security supervisors had to undergo diversity training, and that training was completed by the end of the calendar year. Significantly, moreover, McKinney experienced no further racial harassment.

For all of these reasons, the court concludes that the undisputed evidence shows G4S has established the first prong of its defense as a matter of law.

### 3. The second prong of the affirmative defense is satisfied as a matter of law.

G4S has also established that McKinney unreasonably failed to utilize its reporting procedure. First of all, as a factual matter, it is clear that he did not follow the complaint procedures. Instead he complained only after the noose and sheet incident, and only to co-workers or Army and BAE personnel. This failure alone may satisfy the second element. *Barrett*, 240 F.3d at 267 ("Any evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy [the company's] burden under the second

element of the defense.") (internal quotation marks omitted). Notably, moreover, McKinney did not complain after earlier incidents (such as Altizer's 2012 "colored boy" comment and Roth's 2011 use of the N-word in his presence), and his failure deprived G4S of opportunities to address the harassment earlier. *Matvia*, 259 F.3d at 269 ("If Title VII's prohibitions against [racial] harassment are to be effective, employees must report improper behavior to company officials.").

G4S emphasizes that McKinney began making recordings of his co-workers and supervisors in approximately October 2013, in order to support a lawsuit on racial harassment grounds, although if they did not help his case, he erased them. He retained five conversations from October 9 to December 11, 2012, that totaled almost three hours. (Morrow Decl. ¶ 6, Dkt. No. 44-1, at 56–57.) He also made recordings in 2013, including at least three before the May 23 incidents. (*Id.*) Although plaintiff describes G4S's discussion of the recordings as a "shameful" accusation that McKinney was manufacturing a lawsuit (Pl.'s Opp. at 14 n. 11), the court concludes that his recording of conversations to support his lawsuit is relevant—and important—evidence about whether McKinney's failure to report harassment was reasonable. That is, McKinney stated that he felt harassed beginning as early as the Fall of 2012, and apparently harassed severely enough to believe he might someday file a lawsuit, but he never reported that harassment to give G4S an opportunity to address it. *See Matvia*, 259 F3d at 270 (reasoning that a plaintiff's conduct with regard to reporting must be "examine[d] . . . from the time the unwelcome conduct began.").

Furthermore, it is no excuse that he was trying to gather evidence, and indeed, such excuse was rejected by the Fourth Circuit in *Matvia*. There, the employee had said she was collecting evidence against her harasser so that she could present a strong case to her employer. 259 F.3d at 269. The Fourth Circuit reasoned that it understood "why [the plaintiff] would want

27

tangible evidence" to support her version of events, but held that her desire did not "excuse her failure to report" the harassing conduct.  *Id.*  "*Faragher* and *Ellerth* command that a victim of [racial] harassment report the misconduct, not investigate, gather evidence, and then approach company officials."  *Id.*

Moreover, McKinney's arguments now that he feared retaliation or that it was better to complain to the more-responsive BAE and Army personnel, such as Suthers and Penland, do not excuse his failure to comply with G4S's policy.  The Fourth Circuit, in both *Barrett* and *Matvia*, recognized that fears of retaliation or ostracism do not excuse a failure to comply with the reporting procedures in an employer's policy.  *Matvia*, 259 F.3d at 270 (noting a report of harassment might result in a "negative reaction from coworkers," or in retaliation, but stressing that "[t]he reporting requirement is so essential to the law of sexual harassment that we 'have refused to recognize a nebulous fear of retaliation as a basis for remaining silent.'") (quoting *Barrett*, 240 F.3d at 267)); *Barrett*, 240 F.3d at 267 ("[T]he law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit.").

Likewise, McKinney's claim that he followed the complaint procedure because he protested to Lewis and/or Gellner during the two incidents or said to Gravley, "I thought we were boys," does not constitute compliance with G4S's complaint procedure.  First of all, it did not occur until years after Roth's use of the N-word in McKinney's presence and months after the first act of alleged harassment toward McKinney, the Altizer comment in the fall of 2012. Second, complaining to the alleged harasser is "clearly unreasonable," since he "is part of the problem, not the solution."  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009).  Further, if a complaint or objection to the supervisor/harasser were sufficient, then it

seems an employer would very rarely, if ever, receive the benefit of the affirmative defense, because it is very unlikely that most harassers would report themselves.

For all of these reasons, G4S has established, as a matter of law, its affirmative defense to McKinney's hostile work environment claim.

## C. Plaintiff's Retaliation Claim Fails Because the Undisputed Facts Establish That He Did Not Suffer a Materially Adverse Action.

In order to succeed on his claim of retaliation under either Title VII or Section 1981, McKinney must first establish all three elements of a prima facie case: "(1) that the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted); *see Boyer-Liberto*, 786 F.3d at 281 ( "A prima facie retaliation claim under 42 U.S.C. §1981 has the same elements."). If G4S rebuts the prima facie case by producing a legitimate, non-discriminatory reason for the adverse action, then McKinney must show that the given reason is pretextual. *Id.*

G4S raises a number of arguments as to McKinney's retaliation claim, but the court need only address one, because it is dispositive. Specifically, the court agrees with G4S's argument that McKinney has failed to produce evidence in support of the second element of his prima facie case, that he suffered a materially adverse action sufficient to support a retaliation claim. G4S acknowledges—as it must—that a retaliation claim need not be based only on a tangible job action and instead that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 66 (2006). For an action to be sufficiently adverse to support a retaliation claim, a plaintiff must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable

29

worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). But "trivial harms," "petty slights," and "minor annoyances" will not constitute a materially adverse action in this context. *Id.*

As already noted in the above discussion of whether McKinney suffered a tangible employment action for purposes of *Faragher* and *Ellerth*, the Fourth Circuit has repeatedly held that the types of "retaliatory" actions McKinney alleges here are insufficient to constitute a materially adverse action for purposes of a retaliation claim. *See, e.g.*, *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2009) (concluding that plaintiff's allegations that he was "excluded from certain meetings and emails," that he received a negative employment evaluation and that he was ostracized were not adverse employment actions); *Matvia*, 259 F.3d at 270–71 (holding that the plaintiff's allegations of "uncivility" by her co-workers, "most of which constituted refusals to speak to her," did not constitute an adverse action to support a retaliation claim); *Munday*, 126 F.3d at 243 (4th Cir. 1997) ("In no case in this circuit have we found an adverse employment action to encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity.").

McKinney argues, though, that "[t]he write-ups alone are sufficient to establish retaliation, especially given that they could affect McKinney's opportunities to be promoted or could even contribute to a demotion or termination." (Pl.'s Opp. at 34.) He relies for support almost entirely on a single case, *Wilson v. City of Des Moines*, 338 F. Supp. 2d 1008, 1018–22 (S.D. Iowa 2004), and the authority cited therein. The court is not persuaded by this argument.

First of all, *Wilson* is not binding on this court and it is factually distinguishable because the plaintiff there received numerous warning letters, had her pay docked, had sick leave docked, had a safety award revoked, and was ultimately terminated, *id.*, actions significantly more

30

detrimental than the conduct on which McKinney relies.  The court there pointed to a "pattern" of possible retaliatory conduct based on "the timing and type of job assignments given" or the "timing and type of discipline taken against" her.  *Id.* at 1031–32.  Further, even if *Wilson* correctly stated the law in the Fourth Circuit, McKinney has not presented any evidence that the two employee counseling "write-ups" could contribute to a demotion or termination.  Indeed, the only evidence as to their effect is contrary to his assertion:  in the same month he received the two write-ups, he received a transfer to a more desirable shift.[15]

Furthermore, McKinney repeatedly testified that he believed he received those write-ups because Lewis was upset that he had been "called out on the carpet" for working McKinney and others for too many hours.  (McKinney Dep. at 180–81, 184–86, 188.)  While McKinney's attorney now argues that the write-ups were retaliation for complaining to those involved in the noose and sheet incidents the day before, such an assertion flatly contradicts McKinney's deposition testimony.  *Cf. Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 422 (4th Cir. 2014) (noting the well-established rule that a party cannot defeat summary judgment by submitting an affidavit conflicting his own prior deposition testimony because "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct") (citation omitted).  Because McKinney has failed to present sufficient evidence from which a jury could find that any adverse

---

[15] McKinney has provided a declaration (prepared after his deposition) averring that he has been excluded from meetings, that "vital information was conveyed" during those meetings and that, as a result of not receiving that vital information, he was counseled.  (McKinney Decl., Dkt. No. 50-20.)  He does not provide any specific information as to what was conveyed or as to how or when it caused him to be counseled.  Thus, the affidavit does not preclude summary judgment.  *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (affirming grant of summary judgment and explaining that the plaintiff's "conclusory statements, without evidentiary support," were insufficient to create a genuine issue of fact).  Even assuming that his vague declaration supplements rather than contradicts his deposition and that the court could consider it as summary judgment evidence, no reasonable jury could conclude that such a counseling, in the circumstances of this case, is materially adverse.  This is so because McKinney has not presented any evidence that this counseling was so significant that it would "dissuade[] a reasonable worker" from engaging in protected activity.  *Burlington N. & Santa Fe. Ry.*, 548 U.S. at 66.

31

action was taken against him, G4S is entitled to summary judgment on his retaliation claim.

**D. McKinney's Emotional Distress Claim Is Not Supported By Sufficient Evidence.**

To prevail on an intentional infliction of emotional distress claim, a plaintiff must prove, by clear and convincing evidence, that: (1) "the wrongdoer's conduct is intentional or reckless," (2) "the conduct is outrageous and intolerable," (3) "the alleged wrongful conduct and emotional distress are causally connected," and (4) "the distress is severe." *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (*citing Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)). Furthermore, intentional infliction of emotional distress claims are not favored under Virginia law. *Barrett,* 240 F.3d at 268.

The *Barrett* court explained that:

> A showing of severe emotional distress, as opposed to generalized emotional distress, is required because "the injuries in such cases are too hard to determine with any reasonable certainty—are more often assumed than real—and the suit too liable to be wholly speculative. If everyone was allowed damages for injuries to his feelings caused by someone else, the chief business of mankind might be fighting each other in the courts." *Ruth v. Fletcher*, 377 S.E.2d 412, 415 (Va. 1989). This is why "such torts are 'not favored' in the law." *Id*. (quoting *Bowles v. May*, 166 S.E. 550, 555 (Va. 1932)).

240 F.3d at 269.

G4S argues that McKinney cannot establish either the second or fourth element above. That is, it contends the conduct at issue was not outrageous and intolerable, and that McKinney did not suffer from *severe* emotional distress. The court need not address the first of these arguments because the second is persuasive.[16] Quite simply, the allegations by McKinney are

---

[16] Although it does not need reach the issue, the court notes that there is authority suggesting the conduct here might not satisfy the "severe and outrageous" requirement for the tort. *See, e.g. Coles v. Carilion Clinic*, 894 F. Supp. 2d 783, 796–97 (W.D. Va. 2012) (holding that plaintiff's allegations failed to establish conduct sufficiently "severe and outrageous" to support an emotional distress claim, where fellow employees frequently referred to him as a drug dealer and by using the N-word, and where he was subjected to the display of shackles and a noose in the

insufficient to satisfy this element, which requires that he prove emotional injury "so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163; *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 436 (4th Cir. 2006) (same).

McKinney describes his emotional distress damages as involving several components. First, it increased his blood pressure, for which he has sought medical treatment and which he (and his nurse practitioner) attribute to work-related stress. Second, he experienced sleeplessness as a result of the harassment. Before the May 2013 events, he slept about 6 or 7 hours a night, but afterward, he could sleep only 2 to 3 hours a night for about four months, and, at the time of his deposition, was up to 4 to 5 hours a night. Third, he felt nervous and anxious over being watched at work and receiving verbal counseling. In addition to his stress at work, he also testified that he and his wife were having marital difficulties at the same time or shortly after the May 2013 incidents, which he attributes to him being upset over the racial harassment. He also believes he suffers from depression, but he has never received that diagnosis from a medical provider. (McKinney Dep. 247–69.)

In terms of treatment, he said that he saw a nurse practitioner for his blood pressure and that he took an over-the-counter medicine to help him sleep. He explained that he did not seek more medical care because of medical bills from his daughter's recent birth and his concern over the cost of care. He testified that he sometimes still experiences nervousness and anxiety at

---

workplace, and also subjected to references to the Ku Klux Klan and lynching); *Webb v. Baxter Healthcare Corp.*, 1995 WL 352485, at *6 (4th Cir. June 13, 1995) (concluding that the plaintiff's allegations that she was repeatedly ridiculed based on her gender, religion, and disability were insufficient to state a claim for emotional distress under Virginia law); *Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (noting that, in emotional distress cases, liability "has been found only where the conduct has been so outrageous in character, and so outrageous in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (quoting *Russo*, 400 S.E. 2d at 162); *see also Crittendon v. Arai Americas, Inc.*, 2014 WL 31490, at *6 (E.D. Va. Jan. 3, 2014) (dismissing intentional infliction of emotional distress claim and noting that the second prong, requiring outrageous and intolerable conduct, "is seldom met by plaintiffs under Virginia law").

work, but only if Allison is also at work. Lastly, he admitted he never sought medical treatment for his depression, but says he spoke to his pastor. (*Id.*)

This evidence is insufficient for a jury to conclude, by clear and convincing evidence, that he suffered the type of "severe emotional distress" that would satisfy the fourth element of his claim. *See, e.g.*, *Russo*, 400 S.E.2d at 163 (concluding "stress and its physical symptoms" did not constitute severe emotional distress); *Gray v. Home Depot*, 2015 WL 224989, at *5 (E.D. Va. Jan. 15, 2015) (dismissing emotional distress claim for lack of severe distress where plaintiff alleged embarrassment, back muscle spasms, extreme high blood pressure, and depression, and alleged that he had received both physical therapy and psychiatric treatment). The court thus concludes that the entry of summary judgment in G4S's favor as to McKinney's state law claim is required.

### III.  CONCLUSION

For the foregoing reasons, the court will grant G4S's motion for summary judgment as to the entirety of McKinney's complaint. A separate order will be entered.

Entered: March 31, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge